UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

COBEY BRAQUET                         CIVIL ACTION NO. 6:15-cv-02881

VERSUS                               JUDGE WALTER

U.S. COMMISSIONER,                   MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for further administrative action.

## ADMINISTRATIVE PROCEEDINGS

The claimant, Cobey Braquet, fully exhausted his administrative remedies

before filing this action in federal court. He filed an application for supplemental

security income benefits ("SSI"), alleging disability beginning on January 7, 2011.[1]

His application was denied.[2] He then requested a hearing,[3] which was held on April

---

[1]     Rec. Doc. 8-1 at 157.

[2]     Rec. Doc. 8-1 at 104.

[3]     Rec. Doc. 8-1 at 123.

22, 2014 before Administrative Law Judge Kathleen Molinar.[4] The ALJ issued a decision on August 19, 2014,[5] concluding that the claimant was not disabled within the meaning of the Social Security Act from May 24, 2013 through the date of the decision. Despite the claimant's request for review of the decision, the Appeals Council concluded that there was no basis for review.[6] Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on October 16, 1978.[7] At the time of the ALJ's decision, he was 35 years old, and he is now 38 years old. He completed the twelfth grade,[8] and has relevant work experience as a farm worker, a laborer and galley hand in the oilfield, a horse groomer, and a bagger in a retail store.[9] He alleged that he

---

[4]  Rec. Doc. 8-1 at 29-56.

[5]  Rec. Doc. 8-1 at 14-25.

[6]  Rec. Doc. 8-1 at 4.

[7]  Rec. Doc. 8-1 at 62, 157.

[8]  Rec. Doc. 8-1 at 34, 64.

[9]  Rec. Doc. 8-1 at 35, 64-65.

injured his neck and back in a motor vehicle accident in September 2005.[10] He filed

applications for Social Security benefits in 2009, 2011, and 2013,[11] alleging in the

most recent application that he has been disabled since January 7, 2011[12] due to back

and neck surgery, severe depression, bipolar disorder, and kidney problems.[13]

The claimant treated with Dr. Kenneth Fournet in St. Martinville, Louisiana

from April 5, 2010 through June 11, 2013.[14] Dr. Fournet treated him for chronic

depression, prescribing Prozac and other medications, and also treated him for pain

complaints related to his earlier surgeries, prescribing Flexeril (muscle relaxant),

Ibuprofen (for pain relief), Buspar (for anxiety), Cyclobenzaprine (muscle relaxant),

and Tramadol (for pain relief).

The claimant received mental health treatment from the New Iberia Behavioral

Health Center in New Iberia, Louisiana, from October 2011 through August 2013.

On October 27, 2011, the claimant was seen for the first time and admitted to the

clinic for psychiatric evaluation and group or individual therapy.[15] He indicated that

---

[10]    Rec. Doc. 8-1 at 36, 228, 403.

[11]    Rec. Doc. 8-1 at 36.

[12]    Rec. Doc. 8-1 at 35, 157.

[13]    Rec. Doc. 8-1 at 176, 195.

[14]    Rec. Doc. 8-1 at 240-246.

[15]    Rec. Doc. 8-1 at 285-295.

he had depression, crying spells, anxiety, panic attacks, problems with anger, and problems with sleep. He indicated that his only friends are family members because he keeps to himself. He reported a history of hallucinations and a suicide attempt by drug overdose about eight months earlier. He stated that his parents and two brothers have substance abuse and/or mental health issues. He also reported having been diagnosed with bipolar disorder and explained that he has had chronic pain since a motor vehicle accident in September 2005 followed by surgery in November 2005.

On November 28, 2011,[16] the claimant was diagnosed with Bipolar II Disorder and assigned a Global Assessment of Functioning score of 50,[17] indicating that he had serious impairments in functioning. He followed up at the clinic on March 7, 2012.[18]

The claimant was seen at the Raymond F. Schneider Memorial Medical Center in Loreauville, Louisiana on June 18, 2012.[19] His chief complaint was an abnormal

---

[16]     Rec. Doc. 8-1 at 296.

[17]     The GAF scale is used to rate an individual's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. A GAF score in the 41 to 50 range indicates "serious symptoms" such as suicidal ideation, or any serious impairment in social, occupational, or academic functioning (e.g., no friends or an inability to keep a job). The GAF scale was dropped from DSM–5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013).

[18]     Rec. Doc. 8-1 at 284.

[19]     Rec. Doc. 8-1 at 230-231.

urine screen at Drug Court, although he claimed that he had done nothing to alter the outcome of the test. He was described as looking thin, malnourished, and gaunt, and he complained about weight loss and poor appetite.

On August 14, 2012, the claimant was seen in the emergency department at University Medical Center in Lafayette, Louisiana.[20] He complained of "off and on" bilateral low back pain that had been worsening over the past month without injury or fever, slight occasional bleeding while urinating, and difficulty urinating. He gave a history of being bipolar, having chronic depression and anxiety, having hypertension, and having had two back surgeries and a neck surgery. He was diagnosed with urethritis and exacerbation of chronic low back pain. He was prescribed Flexeril (a muscle relaxant) and Naprosyn (a nonsteroidal anti-inflammatory drug and painkiller).

The claimant was seen again at the New Iberia Behavioral Health Center on September 10, 2012 for individual psychotherapy.[21] At that time, it was noted that he had stopped taking Tegretol because it increased his heart rate and interfered with his ability to stay focused. He was encouraged to get out of the house more frequently, such as by taking his dogs for a walk, in order to increase his comfort

---

[20]     Rec. Doc. 8-1 at 250-260.

[21]     Rec. Doc. 8-1 at 281-283.

level around people. He was described as a candidate for anger management classes. His mood was slightly irritable but his attitude was cooperative. On September 14, 2012,[22] the claimant returned to the clinic, and it was noted that he had missed some appointments. He again explained that he had stopped taking Tegretol because of the side effects. Because he had previously had good results with Prozac but stomach problems while taking Depakote, it was decided that he would retry Prozac, Depakote ER, and Buspar. He continued to be anxious and depressed, with a blunted affect.

The claimant saw Dr. Andre Viator, a family medicine physician in Loreauville, Louisiana, on November 8, 2012.[23] He complained of low back pain, for which he was prescribed Flexeril. A serum drug screen was conducted due to a previous diluted urinary drug screen.

The claimant returned to the same family medicine practice on November 16, 2012 and saw Dr. Brock Romero.[24] He was upset because the urine specimens he submitted to Drug Court were dilutional despite his having been sober for over nineteen months. Lab results obtained by Dr. Romero were normal, nondilutional, and negative for drugs and alcohol. Dr. Romero consulted with a kidney specialist,

---

[22]     Rec. Doc. 8-1 at 279-280.

[23]     Rec. Doc. 8-1 at 348-350.

[24]     Rec. Doc. 8-1 at 317.

the plaintiff's attorney, and the judge. Dr. Romero noted that the claimant was taking Prozac, which can cause polyuria ( excessive thirst and fluid intake). The claimant was advised to restrict fluids for 24 hours before urine collection.

On December 6, 2012, the claimant saw Dr. Gerard F. Sigue of Acadiana Renal Physicians in New Iberia, Louisiana,[25] complaining of being very weak, shaking, and having chest pain. He gave a history of having been malnourished as a child, having had ADHD as a child, the existence of mental and psychological problems in his biological family including two brothers who are mentally retarded, a serious motor vehicle accident in 2005, a major depression in 2006, a diagnosis of bipolar disorder in 2007, and being in Drug Court due to his third offense OWI. Dr. Sigue's impressions were urinary concentrating defect/polyuria (the production of abnormally large amounts of dilute urine), mild hypophasphatemia (low levels of phosphate in the blood), history of hypertension, history of alcohol abuse, and hyperuricosuria (excessive amounts of uric acid in the urine).

The claimant returned to Dr. Sigue on December 13, 2012,[26] feeling a lot better. His mild hypophasphatemia had resolved, but the doctor recommended that he undergo further testing related to the polyuria.

---

[25]     Rec. Doc. 8-1 at 266–268, 323.

[26]     Rec. Doc. 8-1 at 264-265.

On December 17, 2012,[27] the claimant was admitted to Iberia Medical Center in New Iberia, Louisiana, for a water deprivation test due to his complaints of polyuria. The test showed no evidence of nephrogenic diabetes insipidus and his drug screen was negative.

The claimant saw Dr. Sigue again on January 3, 2013,[28] following up after the water deprivation testing. The doctor's impressions included polyuria and diluted urine due to psychogenic polydipsia that required twelve hours of fluid restriction for the claimant's urine to appropriately concentrate. He was counseled on how to avoid dehydration, and the doctor noted that he had an 80% chance of continued diluted urine voids for life.

On April 11, 2013,[29] the claimant returned to New Iberia Behavioral Health Center, reporting depressed mood, mood swings, increased energy at times, poor sleep due to racing thoughts, and somewhat improved anxiety following a medication change. He denied suicidal ideation but reported rare audiovisual hallucinations. He indicated that he only goes in public for AA meetings two to three times per week and sometimes goes a few days without attending to activities of daily living. The

---

[27]     Rec. Doc. 8-1 at 303-309.

[28]     Rec. Doc. 8-1 at 262-263.

[29]     Rec. Doc. 8-1 at 277.

therapist indicated that the claimant is resentful about his back injury and his legal issues, contending that he should not be in Drug Court because he has not had a drink since 2011 and his drug screens are not accurate due to drinking liquids excessively.

The claimant returned to the Raymond F. Schneider Memorial Medical Center on May 15, 2013.[30] His primary complaint was chronic back pain. He was prescribed steroid cream for dermatitis and Aleve and Tylenol for pain.

The claimant returned to the New Iberia Behavioral Health Center on July 1, 2013,[31] reporting an increase in mood swings but otherwise doing well. His Depakote dosage was increased, and his Prozac and Buspar prescriptions were continued. He followed up on August 12, 2013,[32] reporting depressed mood, apathy, an inability to experience pleasure, low energy, and isolating behavior. He denied suicidal ideation and hallucinations. He stated that his moods were not stable but his depression seemed to be improving following a recent medication change. He continued to describe himself as "stuck" due to his physical condition and the inability to receive disability benefits.

---

[30]     Rec. Doc. 8-1 at 228-229.

[31]     Rec. Doc. 8-1 at 274-275.

[32]     Rec. Doc. 8-1 at 276.

On that same date, MRIs of the claimant's lumbar spine and cervical spine were obtained at Dr. Fournet's request. The MRI of the lumbar spine[33] showed post-laminectomy changes at L5, abnormal signal obliterating the right lateral recess just below the L5-S1 level possibly representing fibrosis involving the right S1 spinal nerve that needed to be correlated clinically, and moderately severe discogenic degenerative changes at L3-4 without significant vertebral canal/foraminal narrowing or spinal nerve encroachment.

The cervical MRI[34] showed an anterior fusion of the C5-6 level with discectomy, vertebral canal stenosis at the C4-5 level related to broad-based posterior disc protrusion and ligamentum flavum thickening with associated encroaching on the spinal cord and minimal fluid signal intrinsically within the cord suggesting cord edema or myelomalacia, and mildly severe disc pathology at C3-4 and C6-7 resulting in minimal anterior thecal sac effacement and foraminal narrowing.

In October 2013, the claimant began seeing Dr. William F. Kortum for pain management. At that time, he had a decreased range of motion in both the cervical spine and the lumbar spine, neurological deficits in his hand and feet, a limp and weakness in his legs, muscle spasms, and trigger points. Dr. Kortum prescribed

---

[33]      Rec. Doc. 8-1 at 421-423.

[34]      Rec. Doc. 8-1 at 425-426.

Lortab, Mobic, and another illegible medication.[35]  He diagnosed the claimant with chronic pain syndrome and noted that depression was a coexisting illness.  The claimant saw Dr. Kortum again on November 19, 2013,[36] December 17, 2013,[37] February 13, 2014,[38] March 27, 2014,[39] and May 6, 2014.[40]  In December 2013, the Lortab was changed to Norco.  On each occasion, Dr. Kortum indicated that the claimant was stable on the current treatment and meeting treatment goals.

On December 30, 2013,[41] the claimant was taken by ambulance to the emergency room at Iberia Medical Center due to an overdose.  He stated that he did not want to live and had taken an unknown amount of Lortab, Tramadol, and Soma.  He had to be restrained and sedated.  The next day, he was transferred to an inpatient psychiatric facility where he could receive a higher level of care.

---

[35]     Rec. Doc. 8-1 at 420, 414.

[36]     Rec. Doc. 8-1 at 419

[37]     Rec. Doc. 8-1 at 418.

[38]     Rec. Doc. 8-1 at 417.

[39]     Rec. Doc. 8-1 at 416.

[40]     Rec. Doc. 8-1 at 415.

[41]     Rec. Doc. 8-1 at 352-378.

Due to the suicide attempt, the claimant was hospitalized at Lafayette General Medical Center from December 31, 2013 to January 7, 2014.[42] Upon admission, his mood was sad, his affect was blunted, and he minimized the suicide attempt. His GAF score was 30. By the time of discharge, he had shown considerable improvement in his mood, affect, and insight; he denied suicidal and homicidal ideation; and his GAF score was 55.

In February 2014, the claimant began treating with Aimee Broussard, APRN at Iberia Healthcare for his mental health issues.[43] His chief complaints were depression and anxiety, and he reported a bipolar disorder diagnosis and several inpatient admissions. He stated that he was formerly treated with Prozac at New Iberia Mental Health Clinic, which helped. Ms. Broussard described him as sad looking with signs of anxiety. He was fully oriented, with no suicidal or homicidal ideation, no apparent signs of hallucinations, delusions, or other psychotic process. His cognitive functioning appeared normal and his insight appeared normal. Ms. Broussard diagnosed Bipolar 1, current or most recent episode, depressed, severe, and anxiety disorder. She prescribed Prozac, Trazodone, Latuda, and Xanax.

---

[42]     Rec. Doc. 8-1 at 380-402.

[43]     Rec. Doc. 8-1 at 427-428.

On April 7, 2014, the claimant was examined by Dr. Roland C. Miller, an orthopedic surgeon.[44] The claimant gave a history of having been involved in a motor vehicle accident in September 2005. He stated that he was severely injured in the accident including fractured ribs and a fractured right clavicle. He reported that once the initial pain began decreasing, he was also found to have a herniated disk in his neck that required a diskectomy and fusion at C5-6 and a herniated disk in his back that required microsurgery at L3-4. Following the back surgery, he experienced spinal fluid leakage that necessitated a second lumbar surgery and a three week stay in the hospital. The claimant told Dr. Miller that he had neck pain radiating to both arms and back pain radiating to both legs, with both the right arm and leg worse then the left. He rated his pain at a constant seven on a ten point scale. He explained that he did not return to work following the accident, and has been assisted financially by his mother since the accident. Dr. Miller's examination revealed that the claimant had pain into his arm and neck with forward flexion and also with lateral rotation to the right. He had tenderness over the right posterior scapula and decreased sensation for light touch over his right hand. The cervical range of motion was limited due to pain. He could forward flex to approximately 50% of normal but could not remain in that position due to significant pain. He experienced pain with extension of the

---

[44]     Rec. Doc. 8-1 at 403-412.

lumbar spine and with direct palpation of the lumbar spine. Dr. Miller reviewed an MRI of the claimant's cervical spine, which showed a fusion with plates and screws at the C5-6 level as well as degeneration of the disk below the C5-6 level. It also showed a disk protrusion at the level above the fusion at C45-5 and degeneration of the disk below the fusion with some protrusion at C6-7. Dr. Miller reviewed an MRI of the claimant's lumbar spine, which showed significant disk degeneration, disk space narrowing, and disk space collapse at the L3-4 level, as well as post-surgical changes at L5-S1 with scar tissue formation. Dr. Miller observed that the claimant was unable to sit for any length of time on the examination table and had to frequently change positions due to pain. Dr. Miller's opinion was that the claimant has chronic, long-term, cervical and lumbar spine pain; that he cannot sit, stand, or walk for any length of time; cannot lift or bend; and is unable to perform any significant work duties. Dr. Miller completed a form titled "Residual Functional Capacity – Physical." On that form, he opined that the claimant can walk or stand for one hour, sit for two hours, and rest for five hours out of an eight-hour work day. Dr. Miller also opined that the claimant can walk or stand for only fifteen minutes at a time, and can sit for only thirty minutes at a time. He noted that the claimant's pain increases over time and requires a change of position. Dr. Miller opined that the claimant requires a cane or walker for balance because his legs are weak. In his

opinion, the claimant can occasionally lift or carry up to ten pounds and should never bend, stoop, squat, crawl, climb, crouch, or kneel. He opined that the pain radiating from the claimant's cervical spine, related to both arms but worse on the right side, limits his ability to reach, handle, finger, and feel. There is an inconsistency in Dr. Miller's opinions in that he indicated that the claimant is not limited in fine/gross manipulation but then indicated that he can spend less than one hour of the work day engaged in bilateral manual dexterity. The latter opinion must be credited because Dr. Miller wrote in a reason for this restriction, stating that neck and upper extremity pain with numbness in the right hand limit the claimant's manual dexterity. Dr. Miller indicated that the claimant can drive only occasionally and also stated that the claimant cannot drive while on his medication because it causes drowsiness and sleepiness. He indicated that he was aware that the claimant has emotional problems or mental dysfunction because he is taking Prozac, Latuda, and Zanax for depression and anxiety. Dr. Miller noted that x-rays and MRIs of the claimant's cervical and lumbar spine provided objective bases for the claimant's pain, and he described that pain as moderate to moderately severe.

On April 22, 2014, the claimant testified at a hearing regarding his symptoms and his medical treatment. He stated that he has pain that radiates from his neck into his arms and causes numbness in the tips of his fingers as well as pain radiating from

his back into both legs but primarily into the right leg, causing it to weaken.[45]  He

testified that he had undergone one surgery on his neck and two on his back.[46]  He

stated that his depression causes major problems including his wanting to be left

alone.[47]  He testified that he does a little housework when he can, that grocery

shopping is difficult because of the amount of walking involved and because he does

not like to be around people; he estimated that the most he can lift is five to ten

pounds; and he stated that he does not do much of anything socially.[48]  He stated that

he can do his personal hygiene on his own but it takes a long time.[49]  He claimed to

have trouble sleeping.[50]  He stated that he was under the care of Dr. Kortum for pain

management, under the care of Aimee Broussard for mental health issues.[51]  He also

stated that he was taking Prozac for depression, Norco for chronic pain, Latuda for

his bipolar condition and depression, and Diazepam for anxiety.[52]  The only side

---

[45]     Rec. Doc. 8-1 at 37.

[46]     Rec. Doc. 8-1 at 37.

[47]     Rec. Doc. 8-1 at 37.

[48]     Rec. Doc. 8-1 at 38.

[49]     Rec. Doc. 8-1 at 39.

[50]     Rec. Doc. 8-1 at 39.

[51]     Rec. Doc. 8-1 at 39-40.

[52]     Rec. Doc. 8-1 at 40.

effect of these medications that he identified was a little drowsiness.[53]  The claimant

testified that he can only walk or stand for about fifteen minutes at a time and can

only sit for about a half hour to an hour at a time.[54]  He testified that his pain

intensifies with lying down too long, standing too long, sitting too long, or moving

around too long.[55]  He testified that it hurts to use his arms over his head.[56]  Although

he stated that he can use his hands to pick up small objects, he stated that he cannot

do it repetitively; he also denied being able to squat or kneel repetitively.[57]  The

claimant stated that he uses a cane for increased stability.[58]  He explained that he was

hospitalized in December 2013 for depression because he attempted suicide by

intentionally trying to overdose on his medication.[59]  He testified that although he

takes his medication as prescribed (except for the suicide attempt) he continues to

experience chronic pain every day while on some days his depression is better than

---

[53]     Rec. Doc. 8-1 at 40.

[54]     Rec. Doc. 8-1 at 40.

[55]     Rec. Doc. 8-1 at 46.

[56]     Rec. Doc. 8-1 at 41.

[57]     Rec. Doc. 8-1 at 41-42.

[58]     Rec. Doc. 8-1 at 42.

[59]     Rec. Doc. 8-1 at 42-43.

on others.[60]  He explained that he is stressed by not having an income and not being able to do the things he would like to do.[61]

## A.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[62]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[63]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[64]

---

[60]     Rec. Doc. 8-1 at 44.

[61]     Rec. Doc. 8-1 at 45.

[62]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[63]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[64]     *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[65]  A court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[66]  Conflicts in the evidence[67] and credibility assessments[68] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[69]

## B.    ENTITLEMENT TO BENEFITS

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[70]

[65]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[66]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[67]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[68]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[69]    *Wren v. Sullivan*, 925 F.2d at 126.

[70]    42 U.S.C. § 1382(a)(1) & (2).

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[71] A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[72]

## C. EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled. This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work at

---

[71]     42 U.S.C. § 1382c(a)(3)(A).

[72]     42 U.S.C. § 1382c(a)(3)(B).

step five.[73] "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[74]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[75] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[76] The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[77]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[78] This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by

---

[73] 20 C.F.R. § 404.1520.

[74] *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[75] 20 C.F.R. § 404.1520(a)(4).

[76] 20 C.F.R. § 404.1545(a)(1).

[77] 20 C.F.R. § 404.1520(e).

[78] *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

expert vocational testimony, or by other similar evidence.[79]   If the Commissioner

makes the necessary showing at step five, the burden shifts back to the claimant to

rebut this finding.[80]

## D.   THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged

in substantial gainful activity since May 24, 2013, the application date.[81]  This finding

is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe

impairments: disorders of the back and affective disorder.[82]  This finding is supported

by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or

combination of impairments that meets or medically equals the severity of a listed

impairment.[83]   The claimant does not challenge this finding.

---

[79]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[80]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[81]    Rec. Doc. 8-1 at 16.

[82]    Rec. Doc. 8-1 at 16.

[83]    Rec. Doc. 8-1 at 17.

The ALJ found that the claimant has the residual functional capacity to perform sedentary work except that he can lift/carry ten pounds frequently and twenty pounds occasionally, sit for a maximum of six hours, walk for a maximum of six hours, and needs to use a cane for balance and standing  Additionally, the ALJ limited the claimant to simple, routine, repetitive one to three step instructions, occasional interaction with supervisors, occasional interaction with coworkers without team work, and no interaction with the public.[84]  The claimant challenges this finding.

At step four, the ALJ found that the claimant is not capable of performing his past relevant work as a bagger, horse groomer, scullion, well service floor worker, and farm worker.[85]  This finding is supported by substantial evidence in the record, and is not challenged by the claimant.

At step five, the ALJ found that the claimant was not disabled from May 23, 2013 (the application date) through August 19, 2014 (the date of the decision) because there are jobs in the national economy that he can perform.[86]  The claimant challenges this finding.

---

[84]      Rec. Doc. 8-1 at 23-24.

[85]      Rec. Doc. 8-1 at 24.

[86]      Rec. Doc. 8-1 at 24-25.

**E.    THE ALLEGATIONS OF ERROR**

The claimant contends that the ALJ erred (1) by picking and choosing evidence supporting her conclusions rather than considering the record as a whole; (2) by failing to consider SSR 96-9P; and (3) by extrapolating a capacity for sustained work activity from activities that the claimant performed on only a limited basis.  The Commissioner responded by arguing that substantial evidence and relevant legal standards support the ALJ's residual functional capacity assessment and that the ALJ properly considered all of the medical evidence rather than selecting and relying upon only the evidence that supported her conclusions.

**F.    THE ALJ'S RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD**

The responsibility for determining a claimant's residual functional capacity belongs to the ALJ.[87]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[88]

---

[87]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[88]    *Martinez v. Chater*, 64 F.3d at 176.

It is undisputed that the claimant underwent cervical spine surgery and lumbar spine surgery following a motor vehicle accident in 2005 and has experienced chronic neck and back pain since then. The ALJ concluded that the claimant's pain is not disabling. In support of that conclusion, she noted that he was not prescribed any pain medication before October 2013. That statement is not supported by the evidence in the record. Dr. Fournet prescribed pain medication as early as April 2010, prescribed Ibuprofen 600 in November 2010, prescribed Ibuprofen 800 in October 2011, advised the claimant to take Aleve in January 2013, and prescribed Tramadol in June 2013.[89] An emergency room doctor at University Medical Center ordered Robaxin and Ibuprofen 800 for the claimant's back pain in August 2012 and prescribed Naprosyn.[90] Furthermore, when the claimant consulted Dr. Miller in April 2014, he reported that he had been under the care of a pain management specialist for a number of years but decided to get off the pain medications because he did not want to become addicted and he did not like taking the pain medication on a regular basis.[91]

---

[89]    Rec. Doc. 8-1 at 243-242.

[90]    Rec. Doc. 8-1 at 356.

[91]    Rec. Doc. 8-1 at 403.

The ALJ's second reason for discounting the claimant's pain complaints was that "Dr. Kortum's treatment notes indicate that once medication was initiated, the claimant was able to perform a wide variety of activities including walking the dogs, cooking, and yard work."[92] The ALJ did not provide a citation to such a treatment note, and this Court was unable to locate one. While Dr. Kortum's treatment notes indicate that, at various times, the claimant's daily activities included yard work, house work, caring for dogs, cooking, and TV, his notes do not indicate either an increase in the amount of time spent on those activities or an increased ease in performing those activities after the claimant started on the medications that Dr. Kortum prescribed.

The ALJ's analysis of the claimant's residual functional capacity focused largely on her impression that the claimant was engaging in activities of daily living that met or exceeded the requirements for sedentary work. She stated that

> Despite impairments. . . the claimant is able to garden, play with his dogs, and cut grass. . . . Claimant [sic] report shows that he can care for his pets, cook simple meals, shop in stores, and pay bills. . . . While he does not drive a car, he is able to ride in a car, go out alone, watch television, and play with his dogs. . . . These activities are inconsistent with his allegations of incapacitating pain and limitation.

---

[92]     Rec. Doc. 8-1 at 22.

It is true that the claimant told the intake personnel at the New Iberia Behavioral Health Center on October 27, 2011 that his hobbies are caring for pets, gardening, maintaining flower beds, and cutting grass. But he did not say how often he engaged in those hobbies or for how long at a time. It is also true that the claimant told Dr. Kortum on various occasions that his daily activities included gardening, cooking, caring for dogs, yard work, and TV. Again, however, there is no indication in Dr. Kortum's records concerning how much time the claimant spends on those activities each day. Although the ALJ cited to a function report[93] in which the claimant stated that he cooks, she failed to note that he stated he *sometimes* cooks, eats a lot of frozen dinners, eats only once per day, and cooks for only two to three minutes at a time. Similarly, while the ALJ noted that the claimant plays with his dogs, the claimant actually said that he plays with his dogs *when he feels well enough to do so*, and explained that he used to play with the dogs outside often but now only plays with them *a little* while indoors. While housework was listed in the claimant's daily tasks, he stated that his mother helps him with housework and yard work, explaining that this type of work hurts his back. The ALJ did not cite the claimant's hearing testimony that he does housework "when I can"[94] or his testimony that family

---

[93]     Rec. Doc. 8-1 at 186-193.

[94]     Rec. Doc. 8-1 at 38.

members often do his housework for him.[95]  While the claimant stated in the function report that he can shop for food, he also stated that he does so only once a month for about fifteen to twenty minutes.  The ALJ did not cite the claimant's hearing testimony that grocery shopping is difficult for him because he does not like to be around people and also because of the amount of walking required.[96]  The ALJ did not cite the claimant's testimony that there are some days when he can hardly move.[97]

The ALJ also found it significant that the claimant was advised to walk his dogs daily.  This recommendation came from a mental health professional who was trying to encourage the claimant "to get out of house more frequently, i.e., taking dogs for a walk. . . for purpose of increasing comfort level around people."[98]  Therefore, this recommendation had nothing to do with the claimant's physical impairments or his functional capacity.

The activities cited by the ALJ, when considered in light of the entire record, do not support the conclusion that the claimant's actual activities meet or exceed the requirements for sedentary work.  Instead, the ALJ inappropriately extrapolated from

---

[95]     Rec. Doc. 8-1 at 38-39.

[96]     Rec. Doc. 8-1 at 38.

[97]     Rec. Doc. 8-1 at 36.

[98]     Rec. Doc. 8-1 at 282 (upper case letters changed to lower case).

the fact that the claimant listed various activities as interests or daily tasks that he was able to perform such activities over the course of an eight-hour day and a five-day work week. Accordingly, this Court finds that the reasons cited by the ALJ for discounting the claimant's complaints regarding his neck and back condition, the pain those conditions cause, and the functional limitations that result from them are not supported by substantial evidence in the record. Instead, it appears that the ALJ was picking and choosing evidence from the record that supported her conclusions and omitting mention or consideration of contrary evidence. An ALJ must consider all of the evidence in a case and cannot "pick and choose" only that evidence that supports a finding of nondisability.[99]

The ALJ continued "picking and choosing" the evidence to support her conclusions throughout her written decision. For example, in summarizing the claimant's visit to University Medical Center on August 14, 2012, the ALJ noted that "[b]ack pain was only off and on."[100] Actually, the treatment notes indicate that the claimant complained of bilateral low back pain that was "off and on" *and* worsening over the past month. Other documents from the same emergency room visit note that the claimant has experienced "chronic back [pain] since '05" and "chronic low back

---

[99] *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

[100] Rec. Doc. 8-1 at 20.

pain [for] years."[101]  The doctor's impression was "exacerbation of chronic low back pain"[102] and "urethritis, exacerbation of chronic low back pain."[103]  Selecting the words "off and on" and adding the word "only" to describe the claimant's back pain on that occasion was improper, especially since his pain was described as chronic four times in the same treatment note.

With regard to the claimant's mental health conditions, the ALJ similarly emphasized certain evidence while failing to consider the record as a whole.  For example, the ALJ stated that "the record reveals only intermittent treatment for depression,"[104] criticized the claimant for being noncompliant with his medication,[105] and criticized him for failing to seek further mental health treatment following his hospitalization in January 2014.[106]

In fact, however, the earliest treatment note in the record indicates that the claimant was already treating with Dr. Fournet for chronic depression in April

---

[101]     Rec. Doc. 8-1 at 252.

[102]     Rec. Doc. 8-1 at 253.

[103]     Rec. Doc. 8-1 at 258.

[104]     Rec. Doc. 8-1 at 18, 22.

[105]     Rec. Doc. 8-1 at 20, 22.

[106]     Rec. Doc. 8-1 at 23.

2010.[107] While depression is not mentioned in each of Dr. Fournet's treatment notes, which are not lengthy or detailed, it must be presumed that he continued to treat the claimant for this chronic condition. Certainly, depression and/or medications for depression or anxiety are mentioned five times in Dr. Fournet's nine treatment notes spanning a three-and-a-half-year time period.

While the claimant was treating with Dr. Fournet, he also began treating at New Iberia Behavioral Health Center, where he was seen on nine occasions between October 2011 and August 2013, a period of less than two years. Thereafter, he was hospitalized and received in-patient treatment following a suicide attempt. His mental health treatment did not stop at that point, as the ALJ suggested. At the hearing, the claimant testified that he was treating with Aimee Broussard of Iberia Healthcare for mental health issues,[108] but the ALJ did not mention that in her ruling. However, records submitted to the Appeals Council following the issuance of the ALJ's ruling substantiate the fact that the claimant began treating at Iberia Healthcare in February 2014.[109] Thus, the record as a whole indicates that the claimant's mental health treatment has not been intermittent and establishes that the ALJ was incorrect

---

[107]     Rec. Doc. 8-1 at 243.

[108]     Rec. Doc. 8-1 at 39.

[109]     Rec. Doc. 8-1 at 427-428.

in suggesting that the claimant stopped seeking mental health treatment following in-patient treatment in January 2014.

The ALJ's reference to the claimant's noncompliance with medication is similarly erroneous. The claimant was prescribed Tegretol while treating at New Iberia Behavioral Health Clinic. The treatment note for September 10, 2012 indicates that the claimant "has been non compliant with medication," but it also states that he advised his counselor that he stopped taking the medication after the first week because of increased heart rate and perceived problems with maintaining focus.[110] A later treatment note reiterates that he stopped taking the medication due to the side effects and goes on to say that he is unable to tolerate Tegretol.[111] A claimant should not be found to noncompliant with medications because he avoids a medication that causes significant side effects. Indeed, the Tegretol was quickly replaced with other medications and no further incidence of noncompliance with medication were noted in the treatment records from New Iberia Behavioral Health Clinic.

In summary, the ALJ's residual functional capacity analysis is not supported by substantial analysis in the record, and this matter must be remanded for a new evaluation of the evidence.

---

[110]     Rec. Doc. 8-1 at 281.

[111]     Rec. Doc. 8-1 at 279-280.

## G. THE ALJ ERRED IN ASSIGNING NO WEIGHT TO DR. MILLER'S OPINIONS

The ALJ used her interpretation of the claimant's physical activities as a basis for giving no weight to the opinions of the claimant's physician Dr. Roland C. Miller, an orthopedic surgeon. Dr. Miller examined the claimant, reviewed MRIs of the claimant's cervical spine and lumbar spine, took an extensive history, and opined about the claimant's functionality. The ALJ, however, completely rejected Dr. Miller's opinions because "[t]he record shows that the claimant is able to perform a wide variety of activities including walking dogs and performing yard work."[112] As noted above, however, the record contains no evidence showing how often or for how long the claimant actually engages in any of the activities cited by the ALJ. Therefore, the record as a whole does not support the ALJ's conclusion that the claimant's actual activity level exceeds the limitations stated in Dr. Miller's report. Consequently, those actual activities are not a valid basis for discounting Dr. Miller's opinions.

Furthermore,

[A]bsent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527[(c)]. . . . This court [ ] holds that an ALJ

---

[112]     Rec. Doc. 8-1 at 23.

-33-

is required to consider each of the § 404.1527[(c)] factors before declining to give any weight to the opinions of the claimant's treating specialist. The ALJ failed to perform this analysis, which should be conducted on remand.[113]

The cited regulation requires an ALJ to consider six factors in deciding how much weight to give to a medical opinion, and the Fifth Circuit requires an ALJ to consider those factors before giving no weight to a treating physician. The factors are: the examining relationship, the treating relationship, supportability, consistency, specialization, and any other relevant factors. In this case, the ALJ did not perform the required analysis regarding Dr. Miller's opinions. Therefore, the ALJ failed to use the proper standard in evaluating Dr. Miller's opinions.

The ALJ's reason for giving no weight to Dr. Miller's opinions is not supported by substantial evidence in the record and she failed to use the proper analytical framework in weighing his opinions. These errors necessitate remand of this matter.

## H.   THE APPLICABILITY OF SSR 96-9P

The claimant argues that the ALJ erred in applying SSR 96-9p, which addresses situations in which a claimant can perform less than the full range of sedentary work. Having found that the ALJ erred in evaluating the claimant's

---

[113]     *Newton v. Apfel*, 209 F.3d 448, 453-56 (5th Cir. 2000).

residual functional capacity, however, this Court will pretermit discussion of this alleged error.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to properly evaluate the claimant's residual functional capacity and properly determine the amount of weight to give to Dr. Roland C. Miller's opinions. The claimant should be afforded an opportunity to supplement the record with updated medical records and to testify at another hearing. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[114]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after

---

[114] See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[115]

Signed in Lafayette, Louisiana, this 11th day of May 2017.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[115] See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).